**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

FARMO S.P.A., and FARMO U.S.A., INC.,

Plaintiffs,

v.

BANZA, LLC,

Defendant.

Civil Action No. 26-1272-GBW

---

Theodore A. Kittila, William E. Green, Jr., HALLORAN FARKAS + KITTILA LLP, Wilmington, Delaware; Ernest J. Galvan, Michael W. Bien, ROSEN BIEN GALVAN & GRUNFELD LLP, San Francisco, California.

*Counsel for Plaintiffs*

Travis S. Hunter, Alexandra Ewing, RICHARDS, LAYTON & FINGER, P.A. Wilmington, DE; Matthew G. Mrkonic, HONIGMAN LLP, Detroit, MI.

*Counsel for Defendant*

**MEMORANDUM OPINION**

October 27, 2026
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Plaintiffs Farmo S.p.A. and Farmo U.S.A., Inc. (together "Plaintiffs" or "Farmo") and Defendant Banza LLC ("Defendant" or "Banza") operate in the business of making specialized pastas. For years, Farmo and Banza had a business relationship. In recent months, the parties' relationship soured, prompting this litigation. Pending before the Court are (1) Farmo's Motion for a Temporary Restraining Order ("TRO Motion") (D.I. 2) and (2) Farmo's Motion for Leave to Take Expedited Discovery ("Discovery Motion") (D.I. 3), which have been fully briefed (D.I. 7; D.I. 16; D.I. 22). For the reasons set forth below, the Court denies Farmo's TRO Motion (D.I. 2) and denies Farmo's Discovery Motion (D.I. 3).

## I. BACKGROUND

### A. Factual Background[1]

#### 1. The Parties

"Plaintiff Farmo S.p.A. is an Italian health-food product and manufacturing company (a Società per Azioni), specializing in gluten-free pastas and nutritional foods since 1998, registered in Italy and with its headquarters and principal place of business in Casorezzo, Milan, Italy." D.I. 4 ¶ 6. Plaintiff Farmo U.S.A., Inc. is a subsidiary company of Farmo S.p.A. that was created to sell Farmo's products in the United States. D.I. 4 ¶ 7.

"Defendant Banza LLC is a Michigan limited liability company focusing on the sale of chickpea pasta and other plant-based foods, with headquarters in New York, New York." D.I.

[1] In support of Farmo's Verified Complaint, Farmo submitted the Verification of Andrea F. Giai ("Ms. Giai"), the founder and Chief Executive Officer ("CEO") of Farmo S.p.A., the parent company of Farmo U.S.A., Inc. D.I. 4-2. Farmo submitted a declaration by Ms. Giai in support of its reply. D.I. 23. In connection with its opposition, Banza submitted a Declaration by Scott Rudolph, co-founder and Chief Financial Officer ("CFO") of Banza. D.I. 18.

4 ¶ 8. "At various times since its founding, Banza has worked with several different contract manufacturers to produce its chickpea pasta products while also producing a substantial proportion of its product in-house, through its subsidiary Virginia Park, LLC at its Riverside, California facility." D.I. 18 ¶ 4.

2. The Parties' Business Relationship and the 2020 NDA

In August 2020, Banza approached Farmo about forming a business relationship. D.I. 4 ¶ 19; *see also* D.I. 18 ¶ 5. In late August 2020, the parties executed a Non-Disclosure Agreement ("NDA") (the "2020 NDA"). D.I. 4 ¶¶ 24, 26; D.I. 18 ¶ 6; *see also* D.I. 4-1, Ex. 3. "Following the execution of the NDA, Banza began sending Farmo individual purchase orders for spaghetti pasta." D.I. 4 ¶ 33. In January and February 2022, the parties discussed moving away from their pre-existing business relationship and toward a long-term partnership. *See, e.g.*, D.I. 4 ¶¶ 34-40 (detailing early discussions in January and February 2022).

3. The 2023 Agreement

"In the summer of 2023, Banza sent Farmo a draft manufacturing agreement it had prepared." D.I. 4 ¶ 41. On September 12, 2023, the parties executed a "Manufacturing Agreement" (the "2023 Agreement" or "2023 Manufacturing Agreement"). D.I. 4 ¶ 51; D.I. 6, Ex. 1 at 1. At a high level, the 2023 Agreement contemplated the sale by Farmo to Banza of "certain dry chickpea-based pasta products described in the Specifications," which were defined as the "Goods". D.I. 6, Ex. 1 § 1.b (Description of Goods). The 2023 Agreement provided that it commenced on the "Effective Date," September 11, 2023, and ended on December 31, 2026, with this duration being the "Initial Term." D.I. 6, Ex. 1 § 1.a. The 2023 Agreement further provided that it would "automatically renew" in twelve-month increments, "unless [Banza] provides [Farmo] with a non-renewal notice at least one hundred and eighty (180) days before the end of the Initial Term…." D.I. 6, Ex. 1 § 1.a. The 2023 Agreement also included exclusivity provisions

operating in both directions. D.I. 6, Ex. 1 § 1.p. In addition, the 2023 Agreement incorporated the 2020 NDA. D.I. 6, Ex. 1 § 1.t.

Notably, Section 2 of the 2023 Agreement expressly incorporated Banza's 2022 Terms and Conditions of Purchase ("Terms and Conditions"), with the caveat that the 2023 Agreement would control over the Terms and Conditions where they conflicted with the 2023 Agreement. D.I. 6, Ex. 1 § 2. Section 22 of the Terms and Conditions, in turn, created two avenues under which Banza could terminate the Terms and Conditions, including a provision whereunder Banza could "terminate this Contract or any of its obligations under this Contract . . . (ii) at any time for any reason upon at-least ten (10) business days prior written notice to Seller (a 'Termination for Convenience')." D.I. 6, Ex. 1 at 85 ("Terms and Conditions") § 22(a). The Terms and Conditions provide that, "[t]his Contract, and all related documents and matters arising out of or relating to this Contract, are governed by, and will be construed in accordance with, the Laws of the State of Delaware, without regard to any conflict of law provisions." Terms and Conditions § 26(f).

4. The 2024 Agreement

In April 2024,[2] the parties executed a second "Manufacturing Agreement" (the "2024 Agreement" or "2024 Manufacturing Agreement"). D.I. 6-1, Ex. 2; D.I. 4 ¶ 72; D.I. 18 ¶ 23. This latter agreement contemplated Banza's purchase of "certain macaroni and cheese products, orzo, elbows," and "other short pasta" from Farmo. D.I. 6-1, Ex. 2 § 1.b. Like the 2023 Agreement, the 2024 Agreement had provisions pertaining to exclusivity, § 1.r; incorporation of the 2020 NDA, § 1.v; and expressly adopted the Terms and Conditions, subject to the same conflict provision, § 2.

[2] There is a small discrepancy in the parties' respective statements regarding that the date the 2024 Agreement was executed. Farmo asserts that "[t]he parties executed the final 2024 Agreement on April 29, 2024." D.I. 4 ¶ 72. Conversely, Banza asserts that, "on April 23, 2024, Banza and Farmo executed a second manufacturing agreement." D.I. 18 ¶ 23. Ultimately, this discrepancy is immaterial to the discussion set forth in this Memorandum Opinion.

5. Banza's Decision to Move On From Its Relationship With Farmo

"Before executing the 2023 and 2024 Agreements with Farmo, Banza manufactured Banza pasta products in-house. Banza has also continued to manufacture Banza pasta products in-house during the entirety of its manufacturing relationship with Farmo." D.I. 18 ¶ 36. "Banza now intends to move forward with a different contract manufacturer for the supply of the pasta products previously produced by Farmo. Notably, Banza's intended new contract manufacturer utilizes an entirely different manufacturing process and product formulation than that previously used by Banza or by Farmo." D.I. 18 ¶ 37. "The process and formulation used by Banza's new contract manufacturer does not require or involve any Farmo trade secrets o[r] confidential information." D.I. 18 ¶ 38. "In fact, the principal reason Banza is changing contract manufacturers is that Farmo's product has significantly lower quality, taste, and texture than at least one other manufacturing option in the marketplace." D.I. 18 ¶ 39. "Banza is therefore moving to a new manufacturer precisely because the new supplier has an entirely different process and approach, which yields a vastly superior product." D.I. 18 ¶ 40.

**B. Procedural History**

On October 1, 2026, Plaintiffs filed their Verified Complaint (D.I. 4), TRO Motion, and Discovery Motion.

The Verified Complaint alleges the following counts: (1) Breach of Contract (Express Breach) – 2023 Agreement ("Count I"); (2) Breach of Contract (Express Breach) – 2024 Agreement ("Count II"); (3) Breach of Contract (Anticipatory Repudiation) – 2023 Agreement ("Count III"); (4) Breach of Contract (Anticipatory Repudiation) – 2024 Agreement ("Count IV"); (5) Breach of Contract – 2020 Non-Disclosure Agreement ("Count V"); (6) Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq.* ("DTSA") ("Count VI"); (7) Breach of Contract (In the Alternative) – 2023 Agreement ("Count VII");

(8) Breach of Contract (In the Alternative) – 2024 Agreement ("Count VIII"); (9) Promissory Estoppel ("Count IX"); and (10) Declaratory Judgment ("Count X").

Plaintiffs' TRO Motion seeks a temporary restraining order requiring Defendant to "immediately cease and refrain from misappropriating [Plaintiffs'] confidential information." D.I. 2. The proposed order accompanying Plaintiffs' TRO Motion seeks broader relief. The proposed order would prohibit Defendant (and affiliated individuals and entities) from (1) "[u]sing Farmo's confidential information without Farmo's express authorization," (2) "[d]isclosing Farmo's confidential or proprietary information to any third party, including but not limited to AGT Foods," and (3) require that Defendant "return Farmo's confidential and/or proprietary information in its possession, custody, or control." D.I. 2-1 at 2. Moreover, the proposed order would remain in effect until "the Court can hold a hearing and issue a decision resolving Farmo's ***forthcoming*** motion for preliminary injunction." *Id.* (emphasis added).[3] Plaintiffs' briefing requests even broader relief than its TRO Motion or the proposed order, including an order compelling Defendant to "prevent, halt, and undue" the actions of AGT, a third party to this litigation, with respect to AGT's alleged misuse of Plaintiffs' confidential information and trade secrets. *See* D.I. 7 at 20. Plaintiffs' motions are fully briefed. D.I. 7; D.I. 16; D.I. 22.

[3] Farmo's reply brief references its "intent to seek a preliminary injunction." D.I. 22 at 10. Thus, while Farmo's briefing, at times, refers to the instant relief sought as a "preliminary injunction," *see* D.I. 7 at 1, the Court understands Farmo not to be currently moving for a preliminary injunction. Farmo's own opening brief, despite its title, makes clear that Farmo "seeks narrowly tailored discovery for its *forthcoming preliminary injunction* in the form of documents requests and interrogatories" and clarifies its requests as being "*in anticipation* of a preliminary injunction." D.I. 7 at 19 (emphasis added).

## II. LEGAL STANDARDS

### A. Temporary Restraining Order

Federal Rule of Civil Procedure 65 governs the issuance of temporary restraining orders. "Like a preliminary injunction, a temporary restraining order is an 'extraordinary and drastic remedy . . . that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Sun v. Bloomberg, L.P.*, No. 25-1007, 2025 WL 2697164, at *1 (D. Del. Sept. 22, 2025) (emphasis in original) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

"The standard for analyzing a motion for a temporary restraining order is the same as that for a motion seeking a preliminary injunction." *Cooper v. Crowl*, No. 25-139-GBW, 2025 WL 753868, at *2 (D. Del. Mar. 10, 2025) (quoting *Mehul v. Smith*, No. 20-1173, 2022 WL 481785, at *2 (M.D. Pa. Feb. 16, 2022)). "Accordingly, a temporary restraining order is warranted if the moving party shows '(1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of the restraining order it seeks, (3) the balance of the equities tips in its favor, and (4) a [restraining order] is in the public interest.'" *Id.* (quoting *Genetech, Inc. v. Immunex R.I. Corp.*, 395 F. Supp. 3d 357, 366 (D. Del. 2019)).

"A movant for preliminary equitable relief must meet the threshold for the first two most critical factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017) (cleaned up). "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*

### B. Breach of Contract under Delaware Law[4]

"Under Delaware law . . . the elements of a claim for breach of contract are a contractual obligation, a breach of that obligation by the defendant, and a causally related injury warranting a remedy." *Calumet Cap. Partners LLC v. Victory Park Cap. Advisors, LLC*, 353 A.3d 88, 112 (Del. Ch. 2026) (citation omitted).

### C. Misappropriation of Trade Secrets under the DTSA

To state a claim under the DTSA, a plaintiff must allege three elements:

> (1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret, 18 U.S.C. § 1839(3); (2) that 'is related to a product or service used in, or intended for use in, interstate or foreign commerce[,]' *id.* § 1836(b)(1); and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret, *id.* § 1839(5).

*Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021). The DTSA defines the term "misappropriation" to include:

> (B) disclosure or use of a trade secret of another without express or implied consent by a person who . . . (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret . . . .

18 U.S.C. § 1839(5)(B).

### D. Expedited Discovery

"Neither the Federal Rules of Civil Procedure nor the Third Circuit Court of Appeals has established a standard governing motions to expedite discovery." *Woodford Eurasia Assets Ltd.*

---

[4] The parties approach the contractual interpretation and breach of contract issues under Delaware law. *See, e.g.*, D.I. 7 at 9 & n.2 (Farmo); D.I. 16 at 13-14 (Banza). For the purposes of resolving Farmo's motions, the Court applies Delaware law to the contractual issues.

*v. Lottery.com, Inc.*, No. CV 23-1317, 2023 WL 8005621, at *5 (D. Del. Nov. 17, 2023) (citing *Schaper v. Lensar, Inc.*, No. CV 23-692-GBW, 2023 WL 4532462, at *3 (D. Del. July 13, 2023)). "Courts, however, have broad discretion to manage the discovery process, and can expedite or otherwise alter the timing and sequence of discovery." *Id.* (citation omitted).

"Courts in the Third Circuit may employ one of two tests for determining the propriety of an expedited discovery request." *Id.* (citation omitted). The first framework, drawn from *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982) ("*Notaro*"), requires the movant to "demonstrate '(1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.'" *Woodford Eurasia,* 2023 WL 8005621 at *5 (citation omitted). The second framework, which is "called the 'reasonableness' test, requires a showing of good cause and is 'considerably more liberal than the *Notaro* standard.'" *Id.* (citation omitted). "Under the 'reasonableness' test, 'the court must weigh the need for discovery at an early juncture in the litigation against the breadth of the discovery requests and the prejudice to the responding party, by considering such factors as (1) the timing and context of the discovery requests, including whether a preliminary injunction hearing has been scheduled; (2) the scope and purpose of the requests; and (3) the nature of the burden to the respondent." *Id.* (citation omitted).

## III. DISCUSSION

### A. The Court Denies Farmo's TRO Motion

A party seeking preliminary equitable relief must show "that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly*, 858 F.3d at 179. As the Third Circuit has explained:

> In addition, irreparable harm is not only harm that is not "speculative," *Boynes v. Limetree Bay Ventures LLC*, 110 F.4th 604, 610 (3d Cir. 2024), but also "harm that cannot adequately be compensated after the fact by monetary damages," *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000). Therefore, the availability of monetary damages "typically will preclude a finding of irreparable harm," *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 n.4 (3d Cir. 2017), and thus "belie[ ] a claim of irreparable injury," *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988).

*Johnson & Johnson v. Samsung Bioepis Co.*, 173 F.4th 454, 460 (3d Cir. 2026). "[A] showing of irreparable harm is insufficient if the harm will occur only in the indefinite future. Rather, the moving party must make a 'clear showing of *immediate* irreparable harm.'" *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (italics in original) (quoting *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989)).

The Third Circuit has held that "when a claim for preliminary injunctive relief 'is based on a breach of contract, irreparable injury may be found in two situations: (1) where the subject matter of the contract is of such a special nature of peculiar value that damages would be inadequate; or (2) where because of some special and practical features of the contract, it is impossible to ascertain the legal measure of loss so that money damages are impracticable.'" *Johnson*, 173 F.4th at 464 (quoting *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987)). Here, the former does not apply, since the relevant agreements "do[] not involve subject matter of a special nature or peculiar value, like unique goods with sentimental worth or real estate." *Id.* (citation omitted) (parties' settlement agreement did not fall within first category).

Farmo alleges the following categories of harm. *First*, Farmo alleges that Farmo has dedicated substantial investment to its performance under the contracts at issues (e.g., purchasing raw materials), and has unpurchased inventory on hand. *See, e.g.*, D.I. 4 ¶¶ 115, 136, 150, 159. *Second*, Farmo alleges that Banza's breaches have caused Farmo to lose profits that it would have

incurred during the duration of the agreement. *See, e.g.*, D.I. 4 ¶¶ 116, 136, 150, 159. *Third*, and similarly to the first, Framo alleges it has contributed "over $1.5 million" to a facility that it built in an attempt to perform under the 2024 Agreement. *See, e.g.*, D.I. 4 ¶¶ 117, 150, 168.

These first three categories of harm are standard reliance or expectation damages that can be compensated for after the fact, if adequately proven at trial.[5] For example, the first and third categories of harm are damages that Farmo allegedly incurred in preparation for or in the course of performance. In Delaware, "[a]s an alternative to [expectation damages], the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, No. CV 2020-0310-JTL, 2020 WL 7024929, at *101 (Del. Ch. Nov. 30, 2020), *judgment entered*, (Del. Ch. 2021), *aff'd*, 268 A.3d 198 (Del. 2021) (cleaned up). As for the second category, "[l]ost profits are an accepted means of quantifying expectation damages in a breach of contract action." *AbbVie Endocrine Inc. v. Takeda Pharm. Co. Ltd.*, No. 2020-0953-SG, 2023 WL 5704055, at *3 (Del. Ch. Sept. 5, 2023) (citation omitted).

Farmo's other allegations of harm fare no better toward meeting its burden to justify a temporary restraining order. *Fourth*, Farmo alleges that it has suffered damages "for the value of the investment in the set-up of the new U.S. manufacturing facility based on Banza's representations and promises in connection with the development of the planned 2026 manufacturing agreement." *See, e.g.*, D.I. 4 ¶ 118. *Fifth*, Farmo alleges it has incurred unspecified damages "related to its market re-entry needs and costs as a result of the prior exclusivity agreement between the parties." *See, e.g.*, D.I. 4 ¶¶ 119, 150, 168. *Sixth*, Farmo alleges it has

[5] The Court assumes, without deciding, that these damages are not barred by provisions appearing in the parties' contracts.

suffered a decrease in its "equity value." *See, e.g.*, D.I. 4 ¶¶ 120, 136, 150, 159, 168. Even assuming that these three categories of damages were recoverable under Farmo's causes of action, on this record, the Court finds that these damages are too speculative to be deemed irreparable harm justifying the imposition of a temporary restraining order and that Farmo can otherwise be compensated via monetary damages at a later time.

Farmo devotes relatively few allegations to its alleged irreparable harm, which turn on Banza's alleged "misuse of Farmo's trade secrets and Confidential Information." D.I. 4 ¶ 122; *see also id.* ¶¶ 182, 205.[6] Farmo alleges, albeit in a conclusory manner, that it will "lose valuable goodwill with its customers and clients and its related market share" and also "lose the advantages it has worked tirelessly to develop in the competitive better-for-you food industry, and in particular suffer even further irreparable harm through the use of its own trade secrets and confidential information by a competitor in that industry." D.I. 4 ¶ 122. Elsewhere, Farmo repeats these same conclusory allegations regarding goodwill and its competitive position, again tying them to the disclosure of alleged trade secrets (but this time not "Confidential Information"), and adds in "the loss of customer relationships, loss of trust and confidence of its remaining clients, . . . loss of business reputation, loss of competitive position, and other losses . . . ." D.I. 4 ¶¶ 182, 205 (similar).

To be sure, "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." *22nd Century Techs., Inc. v. iLabs, Inc.*, No. 22-1830, 2023 WL 3409063, at *5 (3d Cir. May 12, 2023) (quoting *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998)). In the context of trade secrets, the Third Circuit has observed

[6] The Court notes that, although the Verified Complaint contains numerous causes of action, the factual basis for those causes of action center around (1) Banza backing out of the parties' existing business relationship and (2) Banza turning to a third-party to manufacture pasta.

that "misappropriation of trade secrets need not have already occurred to warrant injunctive relief; threatened misappropriation is sufficient." *Fres-co Sys. USA, Inc. v. Hawkins*, 690 F. App'x 72, 76 (3d Cir. 2017) (citing, *inter alia*, 18 U.S.C. § 1836(b)(3)). However, "[a] finding of trade secret misappropriation does not compel a finding of irreparable harm." *Orient Turustik Magazacilik San Ve Tic Ltd. STI v. Aytek USA, Inc.*, No. CV 22-4864 (SDW) (JBC), 2026 WL 1133402, at *4 (D.N.J. Apr. 27, 2026) (citing *Campbell Soup*, 977 F.2d at 92).

On this record, the Court finds that Farmo has failed to make a clear showing of immediate irreparable harm justifying a temporary restraining order in the time until Farmo can move for a preliminary injunction.[7] Moreover, to the extent that Farmo alleges that it believes Banza has disclosed Farmo's confidential information or trade secrets to AGT, these allegations are undermined by the sworn declaration of Banza's co-founder and CFO. *See, e.g.*, D.I. 18 ¶¶ 36-43. Importantly, Banza's CFO avers that its "intended new contract manufacturer utilizes an entirely different manufacturing process and product formulation than that previously used by Banza or by Farmo," that "[t]he process and formulation used by Banza's new contract manufacturer does not require or involve any Farmo trade secrets o[r] confidential information," and that "Banza has not shared any confidential information about the packaging line with its planned new manufacturer or any other third party." D.I. 18 ¶¶ 36-37, 41. Farmo alleges that disclosure can be "strongly inferred from the circumstances," *see, e.g.*, D.I. 4 ¶ 179. However, the Court finds that, at least on the present record, Farmo has failed to meet its burden of showing that this is the case. In other

[7] In the 2020 NDA, the parties acknowledged that money damages may be insufficient to compensate for breach of the 2020 NDA. *See* D.I. 4-1, Ex. 3 § 12. As even Farmo concedes (D.I. 7 at 13), this is not dispositive of the Court's inquiry. *See Cabela's LLC v. Highby*, 362 F. Supp. 3d 208, 224 (D. Del. 2019), *aff'd*, 801 F. App'x 48 (3d Cir. 2020) (collecting cases).

words, on this record, it is quite possible that Banza's new manufacturer is not using Farmo's trade secrets or confidential information.

Farmo further asserts that "the contract must remain in place for Farmo to properly transition and preserve its competitiveness." D.I. 7 at 14. The Court disagrees. To begin, Farmo's proposed order accompanying its TRO Motion does not seek such relief relating to the continued enforcement of the "contract," which the Court understands from context to be the 2023 Agreement and/or the 2024 Agreement. To the extent that this request seeks an order requiring Banza to continue to order pasta from it, a party seeking mandatory injunctive relief bears a heavy burden. *See, e.g.*, *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013) (explaining that "a mandatory injunction is an extraordinary remedy that is only granted sparingly by the courts" and that "when mandatory injunctive relief is sought, 'the burden on the moving party is particularly heavy'" (citations omitted)); *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 390 (3d Cir. 2021) ("It would take a truly extraordinary showing . . . to justify an order ejecting a competitor from the marketplace altogether."). Given that the alleged disclosure of Farmo's confidential information forms the basis of the alleged irreparable harms, the Court finds that Farmo has failed to meet its burden.

Having found that there is no irreparable harm, the Court need not consider the other factors pertinent to issuing a temporary restraining order. *See, e.g.*, *Greater Philadelphia Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 133 (3d Cir. 2020) (stating, in the context of a preliminary injunction that "the moving party must establish the first two factors and only if these 'gateway factors' are established does the district court consider the remaining two factors").

### B. The Court Denies Farmo's Discovery Motion

Farmo moves for leave to take expedited discovery in support of its forthcoming motion for a preliminary injunction. D.I. 3. Having considered the parties' briefing, the Court denies Farmo's Discovery Motion. Discovery shall proceed in the normal course in this action.

## IV. CONCLUSION

For the above reasons, the Court denies Plaintiff's TRO Motion (D.I. 2) and denies Plaintiff's Discovery Motion (D.I. 3). Discovery shall proceed in the normal course in this action. An Order consistent with this Memorandum Opinion will issue.